**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOHN P. HACALA, | : | |
|  | : | Civil Action No. 04-6061 |
| Plaintiff, | : | |
|  | : | **OPINION** |
| v. | : | |
|  | : | |
| SPENCER GIFTS, LLC, SPENCER | : | |
| GIFTS, INC. NONQUALIFIED | : | |
| OFFICERS' RETIREMENT PLAN, and | : | |
| BANK OF AMERICA, | : | |
|  | : | |
| Defendants. | : | |

**Appearances:**

> Michael Kevin Mullen, Esquire
> John P. Campbell, Esquire
> Schenck, Price, Smith & King, LLP
> 10 Washington Street
> PO Box 905
> Morristown, NJ 07963-0905
> > Attorney for Plaintiff

> William T. Reilly, Esquire
> Jane Kimball, Esquire
> McCarter & English, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102-4096
> > Attorney for Spencer Gifts, LLC and
> > Spencer Gifts, Inc., Nonqualified Officers' Retirement Plan

**RODRIGUEZ**, **Senior United States District Judge**.

This matter comes before the Court on motion of Defendants Spencer Gifts, LLC

1

and Spencer Gifts, Inc. Non-Qualified Officers' Retirement Plan for summary judgment

[Docket No. 12].  For the reasons set forth below, Defendants motion will be granted.

## I. BACKGROUND

In 1985, Plaintiff John P. Hacala was hired by Music Corporation of America

("MCA") to serve as President of the retail division of its subsidiary Spencer Gifts, Inc.

("Spencer Gifts").  Pl. Resp. to Def. Stat. of Mat. Facts, ¶ 1.  Plaintiff was on the payroll

at Spencer Gifts and was able to participate in the Spencer Gifts, Inc. tax-qualified

pension plan, the Non-Qualified Officers' Plan, and the MCA 401(k) Employee Savings

Plan ("MCA Plan").  Id. at ¶ 2.

In 1987, Plaintiff was promoted to President and CEO of Spencer Gifts and was

put on the payroll of MCA.  Id. at ¶ 3.  With the exception of the MCA Plan, Plaintiff

could no longer participate in the plans that Spencer Gifts maintained for its employees.

Id.  At this time, Plaintiff became a participant in all of MCA's benefit plans, including a

tax qualified profit sharing plan, later known as the Universal Studios Inc. Profit Sharing

Plan.  Id. at ¶ 4.  Plaintiff remained a participant in the Universal Studios, Inc. Profit

Sharing Plan until 1996.  Pl. Opp. Mot. Summ. J., p. 1.

During the time that Plaintiff was CEO, MCA was acquired by different

companies and the names of the benefit plans changed.  Pl. Resp. to Def. Stat. of Mat.

Facts, ¶ 6.  In 1990, MCA was acquired by Matushita Electric Industrial Co.

("Matushita").  Matushita kept the name MCA.  In 1995, Matushita sold to Joseph E.

Seagram & Sons, Inc.  Matushita changed MCA to Universal Studios, Inc. ("Universal").

Id.  Between 1997 and 1998 Matushita was then acquired by Vivendi S.A. and Universal

Studios, Inc. became Vivendi Universal Entertainment LLP ("Vivendi").  Id.  From that

point until 2002, Spencer Gifts was a wholly-owned subsidiary of Universal Studios and

then Vivendi.  Compl. at ¶ 4.

       After MCA's name change in 1995, Plaintiff was informed that he could no longer

participate in Universal's benefit programs because of a change in the federal tax rules

that govern tax-qualified plans.  Def. Mot. Summ. J., p. 7.   Plaintiff's participation in the

plans was "frozen" until 1998.[1]  Pl. Resp. to Def. Stat. of Mat. Facts, ¶ 10.  Pursuant to

Plaintiff's request, Universal allowed him to participate in a non-qualified retirement plan

for highly paid executives, known as the Universal Studios, Inc. Supplemental Executive

Retirement Plan (hereinafter "Officers' Plan" or "SERP") and the Spencer Gifts, Inc.

Variable Deferred Compensation Plan for Executives. ("NQD").  (Def.  Mot. Summ. J.,

pp. 5-8.)  The Officers' Plan was not the same for every employee; rather, it was a

personal contract that was different for each participant.  Pl. Resp. to Def. Stat. of Mat.

Facts, ¶ 17.

---

       [1]Prior to 1996, Plaintiff, through Spencer Gifts, established a non-qualified plan
known as the "Spencer Gifts Inc. Variable Deferred Compensation Plan for Executives"
("NQD").  Pl. Resp. to Def. Stat. of Mat. Facts, ¶ 8.  The plan was a mirror 401(k) plan
that was designed to permit employees to defer pay that they could not defer under the
MCA Employee Savings Plan.   Prior to Plaintiff's participation in the NQD, a "rabbi
trust" was created for the plan in order to protect all of the participants in the event that
Spencer's was sold.  Id. at ¶ 14.

3

Plaintiff's Officers' Plan read in pertinent part:

> The Employee may retire at any time after attaining age 62 and receive a retirement income payable on the first day of the month following his retirement and on the first day of each month thereafter during the remainder of his life with a guarantee of a minimum of 60 monthly payments, in equal monthly installments, at an annual rate equal to 2 1/2% times his Year of Service, but not exceeding 60% times the average annual Compensation earned by him during the three consecutive calender years in which such average was the highest during the ten consecutive calender years ending on December 31 immediately preceding the date of his retirement, reduced by any benefits to which he is entitled under the Offset Plans and the Federal Primary Social Security Benefit he would be entitled to receive at age 65 if then unemployed, computed under legislation in effect on the date he retires.

Aff. of William T. Reilly, Ex. F, p. SG00002.

Ronald Mangel ("Mangel"), Vice President and General Counsel of Spencer Gifts, as well as, Kevin McNeil, Ken Kahrs, outside counsel James Murphy ("Murphy"), and many other attorneys prepared a draft of Plaintiff's Officers' Plan that did not contain any offset provisions.  Pl. Resp. to Def. Stat. of Mat. Facts, ¶ 20.  They then drafted another version that contained offset provisions; however, per Plaintiff's request, a third draft was created that excluded the NQD plan as an offset.  Id.  The final draft of Plaintiff's Officers' Plan agreement read, in pertinent part, that:

> For the purposes of this Agreement, the term "Offset Plans" refers to the Universal Studios, Inc. Profit Sharing Plan, the Universal Studios, Inc. Supplemental Executive Retirement Plan, and any other plan or program of deferred compensation in which Employee participates (but only to the extent that his account balance or benefit thereunder is attributable to employer contributions and excluding in any case the MCA Employee Savings Plan and the Spencer Gifts Variable Deferred Compensation Plan for Executives, its predecessors and its successors).

Aff. of William T. Reilly, Ex. F, pp. SG00002-SG00003.

On July 1, 1998, the Universal Profit Sharing Plan was merged into the Retirement Savings and Investments Plan for Employees of Joseph E. Seagram & Sons Inc. and Affiliates - Universal Employees, which was the former MCA plan.  Pl. Resp. to Def. Stat. of Mat. Facts, ¶ 38.  This plan was then renamed the "Retirement Savings and Investment Plan for Employees of Joseph E. Seagram & Sons, Inc. and Affiliates-Universal Employees" ("Seagram Plan").  During this time, the Geffen Records 401(k) Savings Plan was merged into the Seagram Plan.  Id.  The Seagram Plan and the MCA Plan were renamed the "Seagram 401(k) Plan-Universal Employees" and were merged into the "Vivendi Universal 401(k) Plan."  Id.

When Plaintiff retired in August 2002, he sought payment of the benefits that were due to him under the Officers' Plan.  Id. at ¶ 53.  Plaintiff chose to receive a lump sum payment.  Id.  The actuary calculated the gross amount of his annual retirement income to be $341,990.00 and his lump sum payment before offsets to be $2,857,030.00.  Id. at ¶ 55.  The first offset deducted was the Universal Studios, Inc. Supplemental Executive Retirement Plan which totaled $191,686.00.  Id. at ¶ 56.  The second offset was the Universal Profit Sharing Plan, which totaled $689,818.00.  Id. at ¶¶ 57-59.  Therefore, the amount that Plaintiff received was $1,975,526.00.  Id. at ¶ 59.

On December 31, 2002, Plaintiff filed a claim for the amount owed to him from his Officers' Plan of $689,818.00 plus accrued interest at the rate of 7.5% per annum

5

from August 31, 2002 until the time that the claim was satisfied.  Id. at ¶ 61.  Plaintiff

asserted that the Universal Profit Sharing Plan was erroneously considered an offset of

the Officers' Plan.  Id. at ¶ 62.  When Spencer Gifts, acting as plan administrator, denied

Plaintiff's claim, Plaintiff filed a request for a review of the written claim by an appointed

Benefit's Committee.  Id. at ¶ 69.

      After the Benefit's Committee reviewed and denied Plaintiff's appeal, Id. at ¶ 72,

he filed the instant Complaint pursuant to federal question jurisdiction, U.S.C. § 1331,

under sections 502(a) and 503 of the Employee Retirement Income Security Act of 1974,

"ERISA", 29 U.S.C. §§ 1332 and 1145, Compl. at ¶ 2.  Plaintiff's Complaint alleges that

the Universal Profit Sharing Plan was erroneously classified as an offset plan and he

should therefore receive the funds that were subtracted from his retirement because of the

offset.  Compl. at ¶¶ 2-11.

## II.  DISCUSSION

### A.      Summary Judgment Standard

      "Summary judgment is proper if there is no genuine issue of material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party is

entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d

471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986));

accord Fed. R. Civ. P. 56 (c).  Thus, a Court will enter summary judgment only when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

6

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the facts might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'"  Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed:

7

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.     Standard of Review under ERISA**

The first issue before this Court is the standard of review to be applied. Defendants argue two different standards of review for this case.  First, Defendants argue in their initial brief that the standard of review to be applied is "de novo review under which 'neither party's interpretation [of the terms of the Plan] should be given precedence over the other's, except in accordance with ordinary contract principles.'"  Def. Mot. Summ. J., p. 30 (quoting Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001)).  Second, Defendants argue in their reply brief that the standard of review to be applied is a review of whether the decision of the plan administrator is reasonable and reached in good faith.[2]  See Def. Reply Mot. Summ. J., pp. 12-13.  Plaintiff maintains that

---

[2]Because the Court finds that the appropriate standard of review is de novo, it is unnecessary to discuss whether Defendants can raise a new standard of review for the

the standard of review is that espoused by Defendants in their initial brief.  Pl. Opp. Mot.

Summ. J., pp. 8-9.  Plaintiff is correct and the Court will apply de novo review of the

administrator's decision.

ERISA provides that a plan participant or beneficiary may bring a suit "to recover

benefits due to him under the terms of his plan, to enforce his rights under the terms of

the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C.

§ 1132(a)(1)(B).  ERISA, however, does not specify a standard of review for an action

brought under § 1132(a)(1)(B).  See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437

(3d Cir. 1997).

The Third Circuit has held that, in general, a top hat plan, the type of plan at issue

here,[3] is reviewed de novo, according to the federal common law of contract.  Goldstein,

251 F.3d at 443; see also Kemmerer v. ICI Ams., Inc., 70 F.3d 281, 288-87 (3d Cir. 1995)

(holding same).  Therefore, neither party's interpretation of the plan should be given more

deference than the other party's.  Id. at 436.  The discretionary decisions of top hat plan

administrators are not entitled to deferential review because the plans are unique under

ERISA's provisions in that they "are not subject to any of [its] substantive provisions,

including its requirements for vesting and funding" and their administrators are not

subject to its fiduciary requirements.  Id. at 442 (internal citations omitted).  Moreover,

_____

first time in a reply brief.

[3]The parties concede that the plan involved here is a top hat plan.  See Def. Mot.
Summ. J., p. 29; Pl. Opp. Mot. Summ. J., p. 7.

because top hat plans are used to compensate only highly-paid executives, who are in a strong bargaining position relative to their employers, they do not require the same substantive protects that are necessary for other employees. Id. (further citation omitted).

However, when the terms of the contract explicitly vest the plan administrator with discretion to interpret provisions of the plan, "ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith–a requirement that includes the duty to exercise the discretion reasonably." Id. at 444. In Goldstein, because the plan gave such discretion,[4] the Third Circuit stated that "the question presented to the [c]ourt is not whether [the defendant's] interpretation offers the best reading of the contract; rather, given the discretion granted to the [plan administrator], the question is whether the interpretation offered by [the defendant] was reached in good faith." Id. at 445; see also Ahearn v. Marsh & McLennan Cos., 124 F. App'x 118, 121-22 (3d Cir. 2005) (applying good faith review rather than de novo review because the plan explicitly vested the plan administrator with discretion[5]).

---

[4]The Retirement Plan granted the Pension Committee "sole authority" to "interpret" the terms of the plan. Id. at 438. The plan stated that:

> decisions made by and the actions taken by [the plan administrator] in the administration of this Excess Plan [(the top hat plan)] shall be final and conclusive for all persons.

Id.

[5]The Supplemental Executive Compensation Program ("SERP") provided as follows:

The court noted that the different standards of review will not create anomalous results because "though an administrator may not receive 'deference' under <u>Firestone Tire</u>, any grant of discretion must be . . . given effect as ordinary contract principles would require, thus minimizing the potential for differing standards of review for identical plan terms." <u>Id.</u> at 444.

Defendants' argument for good faith review fails for at least two reasons. First, the language to which Defendants refer does not come from the top hat plan itself; rather, it comes from the rabbi trust document. A top hat plan, or SERP, is

> a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

29 U.S.C. § 1051(2) (1989). Because the plan is unfunded, the employer does not set aside the funds to pay the deferred compensation; instead, the employer uses the company's assets to pay it. <u>In re IT Group, Inc.</u>, 448 F.3d 661, 665 (3d Cir. 2006). A rabbi trust is a mechanism that allows an employer to "set aside deferred compensation in

---

> The [SERP] shall be administered by the Administrative Committee appointed from time to time . . . the Committee shall have the power and discretion to:
>
> . . . .
>
> . . . interpret the [SERP], to resolve ambiguities, inconsistencies and omissions and to decide questions concerning the eligibility of any person to become a Participant or Plan Participant, such interpretations, resolutions and decisions to be final and conclusive on all persons. . . .

<u>Ahearn</u>, 124 F. App'x at 121.

a segregated fund or trust without jeopardizing a plan's 'unfunded' status if the fund or trust remains 'subject to the claims of the employer's creditors in the evidence of insolvency or bankruptcy.'" Id. (quoting DAVID J. CARTANO, TAXATION OF COMPENSATION & BENEFITS § 20.05[D], at 731 (2004)).

In both Goldstein and Ahearn, the language granting discretion in the plan administrators was contained in the top hat plan (SERP).  Here, Defendants cite language from the rabbi trust, which although it was created to protect assets defined in the top hat plan, it does not govern the top hat plans terms.  Indeed, the language Defendants cite from the rabbi trust defers to the terms of the "plan" for the rules used to determine a participants entitlement to receive benefits and for the rules used to review decisions of the plan administrator.

Second, the language to which Defendants refer is insufficient to vest the plan administrator with discretion to interpret the terms of the policy, such as the meaning of an offset plan.  Defendants allege that discretion is granted to the plan administrator by way of the following language:

> The entitlement of a Plan participant or his or her beneficiaries to benefits under the Plan(s) shall be determined by Company or such party as it shall designate under the terms of the Plan(s), and any claim for such benefits shall be considered and reviewed under the procedures set out in the Plan(s).

Aff. of William T. Reilly, Ex. D, pp. SG00229-SG00230.  Moreover, the claim review language in the SERP, which Defendants do not cite, is equally unavailing.  The claim review procedure in the SERP states, in pertinent part:

12

2.   Decision on Claim.  The Committee shall decide whether to grant or to deny the claim and notify the claimant of its decision . . . .

3.   Claim Review Procedure.

. . .

(c)   After review of the application, the Committee shall render a decision in writing; the written decision shall include specific reasons therefor, and shall make specific references to the pertinent Plan provisions on which it is based.  The decision on review shall be made not later than 60 days after receipt of the request for review.

Aff. of William T. Reilly, Ex. F, pp. SG00016-SG00017.

The language from both Goldstein and Ahearn, which states that the plan administrator has "sole discretion" to interpret the SERP and that decisions of the plan administrator are "final and conclusive," stands in stark contrast to the language at issue here.  The language here merely states that entitlement to benefits shall be determined by the company or its designee and that it will be considered and reviewed under the procedures set out in the plan.  While the Court is mindful that there is likely no magical language that a plan should contain, because the top hat plan here neither vests the plan administrator with sole discretion nor states that decisions of the plan administrator are final and conclusive, the Court will review the plan de novo according to federal common law contract principles.[6]

_____

[6] The standard of review is not the determinative issue given the Court's ultimate disposition.  That is, because the Court finds that the top hat plan contemplates that the Universal Studios, Inc. Profit Sharing Plan is an offset on de novo review, a fortiori the Court would hold that the plan administrator's determination of same was in good faith

There are several principles that a court must consider when reviewing a contract according to the federal common law of contract.  "[T]he plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole.  Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 93 (3d Cir. 1992).  The provisions of an ERISA plan should be construed so as to render none nugatory and avoid illusory promises.  Carr v. First Nationwide Bank, 816 F.Supp. 1476, 1493 (N.D. Cal. 1993) (citations omitted).  An interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to one which leaves any part unreasonable or of no effect.  Musto v. Am. Gen. Corp., 861 F.2d 897, 906 (6th Cir.1988); RESTATEMENT (SECOND) OF CONTRACTS § 203."  Kemmerer v. ICI Ams., Inc., 842 F.Supp 138, 143 (E.D. Pa. 1994).  Moreover, the court "should construe ambiguous language against the interest of the party that drafted it."  Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995).

**C.    Review of the Officer's Plan**

Whether a plan is ambiguous is a question of law for the court.  In re New Valley Corp., 89 F.3d 143, 149 (3d. Cir. 1996).  The court should not simply determine whether, from its point of view, the language is clear; rather, the court should "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  Id. at

---

under discretionary review.

150 (quoting <u>Sheet Metal Workers v. 2300 Group, Inc.</u>, 949 F.2d 1274, 1284 (3d Cir. 1991) (alteration in original)).  To determine whether a term is ambiguous, the court must "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."  <u>Id.</u> (internal citations omitted).  Once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning.  <u>Hullet v. Towers Perrin, Forseter & Crosby, Inc.</u>, 38 F.3d 107, 111 (3d Cir. 1994); <u>see also</u> <u>Talyor v. Continental Group Change in Control Severance Pay Plan</u>, 933 F.2d 1227, 1234 (3d Cir. 1991).

1.      **The Contract Language**

The language from Plaintiff's SERP at issue here is as follows:

> For the purposes of this agreement, the term "Offset Plans" refers to the Universal Studios, Inc. Profit Sharing Plan, the Universal Studios Inc. Supplemental Executive Retirement Plan, and any other plan or program of deferred compensation in which Employee participates (but only to the extent that his account balance or benefit thereunder is attributable to employer contributions and excluding in any case the MCA Employee Savings Plan, and the Spencer Gifts Variable Deferred Compensation Plan for Executives, <u>its</u> predecessors and <u>its</u> successors).

Aff. of William T. Reilly, Ex. F, pp. SG00002-SG00003 (emphasis added).

There are, perhaps, two potential ambiguities in this case.  The first potential ambiguity is whether the "its," emphasized above, modify both the "MCA Savings Plan" and the "Spencer Gifts Variable Deferred Compensation Plan for Executives," rather than

only the later.  The second potential ambiguity is whether the language noted above, that "'. . . Offset Plans' refers to the Universal Studios, Inc. Profit Sharing Plan . . ." is ambiguous in light of the fact that the funds from the Universal Studios, Inc. Profit Sharing Plan were "merged" with the funds in the Retirement Savings and Investment Plan for Employees of Joseph E. Seagram & Sons, Inc. and Affiliates–Universal Employees, formerly the MCA Employee Savings Plan.

### 2.    The Meanings Suggested by Counsel

Plaintiff argues that there are two ambiguities in the Plaintiff's SERP.  First, he argues that the "its" in front of predecessors and successors modify both the MCA Employee Savings Plan and the Spencer Gifts Variable Deferred Compensation Plan for Executives.  In support of this interpretation, Plaintiff relies on the bargaining history between him and the company.  Second, he argues that "[t]he contradiction between the 'specific' language calling for (a) the Universal Studios[, Inc.] Profit Sharing Plan to be an Offset Plan and (b) the predecessors and successors of the MCA Employee Savings Plan to be excluded from Offset Plans is evidence enough that [Plaintiff's] Officers' Plan agreement is ambiguous."  Pl. Opp. Mot. Summ. J., p. 10.  The success of this interpretation necessarily depends on the success of the first.  Based on these arguments, Plaintiff suggests that the SERP excludes as an offset the money in the Universal Studios, Inc. Profit Sharing Plan.

On the other hand, Defendants argue that the language is not ambiguous, and in

any event, Plaintiff's interpretation is unreasonable.  To support its contention that the language is not ambiguous, Defendants rely heavily on the ultimate purpose and goal of the SERP.  Based on these arguments, Defendants suggest that the SERP includes as an offset the money in the Universal Studios, Inc. Profit Sharing Plan.

**3.     The Extrinsic Evidence**

As noted above, extrinsic evidence includes the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.  Each of these will be addressed in turn.

**a.     the structure of the contract**

The purpose of Plaintiff's SERP was to provide him with supplemental retirement income, but not to duplicate a benefit to which he was already entitled.  The structure of the contract indicates this purpose by using the following language:

> The Employee may retire from the date of this Agreement until the age of 65 and receive a retirement income payable on the first day of the month following his retirement and on the first day of each month thereafter during the remainder of his life with a guarantee of a minimum of 60 monthly payments, in equal installments, at an annual rate equal to 2½% times his completed years of service as described above, but not exceeding 60% times the average annual base salary received by him during the three consecutive calendar years in which such average was the highest during the ten consecutive calendar years ending on December 31 immediately preceding the date of his retirement, reduced by any benefits to which he is entitled under the Offset Plans and the Federal Primary Social Security Benefit he would be entitled to receive at age 65 if then unemployed, computed under legislation in effect on the date he retires.

Aff. of William T. Reilly, Ex. F, p. SG00002 (emphasis added).  The SERP defines offset

plans as follows:

> For purposes of this Agreement, the term "Offset Plans" refers to the Universal Studios, Inc. Profit Sharing Plan, the Universal Studios, Inc. Supplemental Executive Retirement Plan, and any other plan or program of deferred compensation in which Employee participates (but only <u>to the extent that his account balance or benefit thereunder is attributable to employer contributions</u> and excluding in any case the MCA Employee Savings Plan, and the Spencer Gifts Variable Deferred Compensation Plan for Executives, its predecessors and its successors).

<u>Id.</u> at pp. SG00002-SG00003 (emphasis added).

> **b.    the bargaining history**

Plaintiff negotiated his right to participate in the Spencer benefits programs in 1997 or early 1998.  Pl. Opp. Mot. Summ. J., p. 14.  The first draft of Plaintiff's SERP did not contain an offset provision; however, outside counsel reviewed it and recommended such language.  The offset language proposed by outside counsel stated:

> For purposes of this agreement, the term "Offset Plans" refers to the Universal Studios, Inc. Profit Sharing Plan, the Universal Studios Inc. Supplemental Executive Retirement Plan, and any other plan or program of deferred compensation in which Employee participates (but only to the extent that his account balance or benefit thereunder is attributable to employer contributions and excluding in any case the MCA Employee Savings Plan, <u>its</u> predecessors and <u>its</u> successors).

Aff. of William T. Reilly, Ex. J, p. SG00073 (emphasis added).

After Plaintiff reviewed the new language, he requested that, in addition to the MCA Employee Savings Plan, the Spencer Gifts Variable Deferred Compensation Plan for Executives be excluded as an offset.  Plaintiff rationalized that the Spencer Gifts Variable Deferred Compensation Plan for Executives was similar to the MCA Employee

Savings Plan in that it was comprised of amounts that he had elected to defer from his take home pay rather than primarily of company provided benefits.  Cert. of Michael A. Mullen, Ex. A, 65:7-13.  Once this addition was approved, the language was added and the final draft was written as follows:

> For purposes of this Agreement, the term "Offset Plans" refers to the Universal Studios, Inc. Profit Sharing Plan, the Universal Studios, Inc. Supplemental Executive Retirement Plan, and any other plan or program of deferred compensation in which Employee participates (but only to the extent that his account balance or benefit thereunder is attributable to employer contributions and excluding in any case the MCA Employee Savings Plan, and the Spencer Gifts Variable Deferred Compensation Plan for Executives, its predecessors and its successors).

Aff. of William T. Reilly, Ex. F, pp. SG00002-SG00003 (emphasis added).

It is the insertion of the phrase "and the Spencer Gifts Variable Deferred Compensation Plan for Executives," that Plaintiff submits is the source of the ambiguity regarding whether the predecessors and successors of the MCA Employee Savings Plan are excluded from the offset plans.  Plaintiff argues that it was a drafting error and that when the language was inserted, the "its" were simply not changed to "their."  Pl. Opp. Mot. for Summ. J., p. 17.  Defendants rely on the plain language of the SERP, the definition of predecessor, and certain Treasury regulations to counter Plaintiff's interpretation.

> ### c.    the conduct of the parties that reflects their understanding of the contract's meaning

The conduct of the parties reflects their understanding of the contract–that the

money from the Universal Studio's, Inc. Profit Sharing Plan was to be included as an

offset.  First, Defendants maintained a separate accounting of the funds from the

Universal Studios, Inc. Profit Sharing Plan once they were transferred, or "merged," with

the Joseph E. Seagram & Sons, Inc. and Affiliates–Spencer plan.  Def. Suppl. Br., Cert.

of Scott Cole, ¶ 3.  Defendants further maintain that the funds were transferred from

Hewitt to Vanguard on March 28, 2002.  Id. at ¶ 4.  At the time of the transfer, Plaintiff's

assets were accounted for as follows:

| | |
|---|---|
| Before Tax: | $  54,228.55 |
| After Tax: | $    2,383.47 |
| Company match: | $  28,809.39 |
| Prior Profit Sharing: | $ 602,064.36 |
| TOTAL: | $ 687,485.47 |

Id. at ¶ 5.  Plaintiff attempts to undermine this fact by noting the absence of such a

breakdown on his statements between 1998 and 2002.  Plaintiff argues that "he applied

for benefits, including the benefits due him under the Officers' Plan, in March or April

2002.  It was only at that time that efforts appeared to have been made to segregate the

MCA Plan account balance from the other assets in the successor plan."  Def. Opp. Mot.

Summ. J., p. 25.  Plaintiff's theory is flawed in several respects.  First, Plaintiff has not

presented any evidence to refute the certification of Scott Cole provided by Defendants,

which confirms that the money was maintained separately, at least on the administrator's

books.  Second, Plaintiff completely ignores the fact that the plan administrator changed

from Hewitt to Vanguard in March of 2002 and that the change in the administrator coincides exactly with the separate account balances being reflected on the statement.

Moreover, Plaintiff offers absolutely no evidence to support the idea that "Universal knowingly took action to convert a specific offset plan to an excluded plan." Pl. Opp. Mot. Summ. J., p. 19. Contrary to Plaintiff's argument, the evidence submitted by him and Defendants suggest that there was no intention to convert the Universal Studios, Inc. Profit Sharing Plan from an offset plan to an excluded plan. First, Plaintiff's own deposition testimony suggests that he knew the funds from the Universal Studio's, Inc. Profit Sharing Plan was considered an offset because he considered the merger to be either a mistake or a gift, even though no one at the company ever advised him that it was a gift.[7] Second, the "What's Happening with Your Profit Sharing Plan (PSP) Account"

---

[7]Q:   Do you know whether anyone had the intent to give you this extra benefit, which in effect it would be?

A:   There were two possibilities–no, I don't know whether anyone did or did not have the intent. But there were two possibilities as I saw it. One was that they had made a gigantic mistake but that was not likely because at the time the merger was done was so close to the time of my contract that human resources had to know about the merger prior to my signing the contract.

                    . . . .

A:   The other thought that crossed my mind was they intended to give me this.

                    . . . .

Q:   No one ever told you that was the case?

A:   No one told me it was; no one told me it wasn't.

pamphlet distributed by Universal indicates that the company intended to keep the PSP

monies separate from the 401(k) monies (formerly MCA Employee Savings Plan).[8]  Cert.

of Kevin Mahoney, Ex. B, p. SG00277.

Plaintiff's proposed interpretation of the offset provision ignores every agreement

and understanding between the parties.  Therefore, the Court finds that Defendants

properly included the balance of the Universal Studios, Inc. Profit Sharing Plan as an

offset from Plaintiff's calculation under his SERP.  Accordingly, summary judgment will

be granted.

### III.  CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment will be

granted.

An appropriate Order will issue this date.


/s/ JOSEPH H. RODRIGUEZ
JOSEPH H. RODRIGUEZ
United States District Judge

DATED: August 2, 2006

_____

Cert. of Michael K. Mullen, Ex. A, pp. 126:19-129:17.

[8]Plaintiff disputes both that he received this notice and that it is clear; however, whether Plaintiff received the notice or not, it is probative of Universal's understanding of the contract's meaning.